IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS


MELINDA HINSON,

                        Plaintiff,

vs.                                                    Case No. 08-4049-SAC

UMB BANK, N.A.,

                        Defendant.


MEMORANDUM AND ORDER

        This discrimination case comes before the court on defendant's motion for summary

judgment. The pretrial order contains several claims, but the plaintiff concedes in her response to

defendant's motion[1] that she proceeds on only two: racial discrimination in failing to promote

her in 2005 to the position of District Manager; and constructive termination on May 4, 2007.

**Facts**

        The court construes contested facts in the light most favorable to the plaintiff, but

excludes those facts which are unsupported by proper citation to the record, facts which are

hearsay in nature for which no exception is asserted, facts not relied on in the argument or

analysis, facts which are irrelevant to the issues currently before the court, as well as legal

conclusions.

        Bobbie Koerner and the plaintiff, an African-American, both worked at Bank of America

before joining UMB. Ms. Koerner then moved to UMB and thereafter began recruiting plaintiff

to join UMB by taking her to lunch, visiting plaintiff at her Bank of America office, and

_____

        [1]*See* Dk. 42, p. 22 (conceding the issue of failure to promote to a dual manager position
in 2006); *Id.,* p. 26 (stating that plaintiff does not assert a separate failure to train claim).

suggesting to plaintiff that she should think about joining UMB. Ms. Koerner did so because she thought plaintiff had a good reputation at Bank of America, had good sales skills and strong leadership qualities, and would be instrumental as UMB sought to build its retail consumer sales business in Topeka. During plaintiff's recruitment, she met with Ms. Koerner and Mr. Michaelis, who both expressed that they wanted plaintiff to come to work for UMB as a BCM. Plaintiff explained to them that it would represent a lateral move for her and that one reason she was considering leaving Bank of America was because she could not grow at Bank of America without relocating. When Ms. Koerner hired plaintiff and negotiated the terms of employment, the plaintiff understood that she would have room to grow and advance her career at UMB.

UMB had four banking centers in its Topeka, Kansas market: the East branch, Midtown branch, North branch, and West branch. Plaintiff began working at UMB in January of 2004 as a Banking Center Manager ("BCM") at UMB's Topeka North Branch. Ms. Koerner, the Regional Manager, was plaintiff's direct supervisor, and Pat Michaelis, Market President, was Ms. Koerner's supervisor. In 2005, plaintiff received the title of Assistant Vice-President, then in the spring of 2006, the title of Vice-President, but the changes in title did not result in additional duties or compensation. Under the plaintiff's management, the Topeka North Branch had the highest volume and productivity of all the branches in Topeka, even though it had fewer employees than two of those branches.

In early 2005, UMB began reorganizing its Kansas markets to add a more structured hierarchy, more banking and customer service managers, more formalized processes and procedures, and a new sales program, Sales Essentials, to replace the older Omega sales program. The new sales program was very similar to the sales process that the plaintiff had used

at the Bank of America. Prior to this 2005 reorganization, UMB's Topeka market was separate from what was previously known as its "Bank 30" branches located in Manhattan, Abilene, Salina, Russell, Luray, Hudson, Great Bend and Concordia, Kansas. Before this reerganization, UMB's Bank 30 branches did not have a BCM function. Instead, they had a lead teller and a Personal Banking Representative ("PBR") who reported directly to the Market President. After the reorganization, UMB's newly created Kansas region covered the geographic area from Topeka to Russell, Kansas.

Part of UMB's reorganization involved setting up in the Kansas region a regional team that consisted of a Regional Manager, a District Manager, and an Operations Manager. Ms. Koerner became the Regional Manager of the Kansas Region, and needed to fill the newly created position of District Manager ("DM") for the Kansas Region. In the first quarter of 2005, Ms. Koerner and Mr. Michaelis considered two candidates for the DM position: plaintiff and another UMB employee named Michelle Beran.

No formal application process was used. Mr. Michaelis did not interview either candidate, but Ms. Koerner spoke with both plaintiff and Ms. Beran about their qualifications and interest in the position. Ms. Koerner interviewed Ms. Beran for the DM position, but did not formally interview the plaintiff. Ms. Koerner approached plaintiff in 2005 about the DM position, told her that the DM position had opened, and stated that the plaintiff "was to be the one to fill that position." She also gave the plaintiff a book to read to help prepare her for a promotion, thus conducting "coaching sessions" with the plaintiff for promotions. Plaintiff believes that she was promised and was offered the DM position, but it was given to a less qualified candidate, Ms. Beran.

Ms. Koerner admits that she initially tried to implement two DM positions, but was told she could implement only one, so she "formally offered" the DM position to Ms. Beran. Ms. Koerner initially selected the individual to be promoted, Mr. Michaelis had the power to veto that selection, and Craig Anderson approved the selection. Ms Beran then began receiving the DM pay for Kansas with the exception of Topeka. Ms. Koerner, who had been receiving and was entitled to receive the DM pay for Topeka, transferred her own DM pay from herself to the plaintiff about the time Ms. Beran became DM for the Kansas region because she appreciated the plaintiff's efforts and leadership in Topeka. The plaintiff did not receive any promotions throughout her employment with UMB. On May 4, 2007, Plaintiff resigned from UMB. Additional facts will be included as necessary in the discussion below.

**Summary judgment standard**

On summary judgment, the initial burden is with the movant to point out the portions of the record which show that the movant is entitled to judgment as a matter of law. *Thomas v. Wichita Coca-Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir.1992), *cert. denied*, 506 U.S. 1013 (1992). If this burden is met, the non-movant must set forth specific facts which would be admissible as evidence from which a rational fact finder could find in the non-movant's favor. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir.1998). The non-movant must show more than some "metaphysical doubt" based on "evidence" and not "speculation, conjecture or surmise." *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Bones v. Honeywell Intern.*, 366 F.3d 869, 875 (10th Cir.2004).

In ruling on a motion for summary judgment, the nonmoving party's evidence "is to be believed, and all justifiable inferences are to be drawn in [that party's] favor." *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Nonetheless, allegations which are legal

conclusions, bare assertions, or merely conclusory are not entitled to the assumption of truth. *See*

*Ashcroft v. Iqbal*, --- U.S. ----, 129 S.Ct. 1937, 1949 (2009). The plaintiff "must still identify

sufficient evidence requiring submission to the jury . . . [and] cannot avoid summary judgment

merely by presenting a scintilla of evidence to support her claim; she must proffer facts such that

a reasonable jury could find in her favor." *Id.* (quotations and citations omitted). "Where the

record taken as a whole could not lead a rational trier of fact to find for the nonmoving party,

there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587. *See Pinkerton v. Colorado*

*Dept. of Transp.*, 563 F.3d 1052, 1058 (10th Cir. 2009). *Turner v. Pub. Serv. Co. of Colo.*, 563

F.3d 1136, 1142 (10th Cir. 2009).

**Timeliness**

Defendant first contends that plaintiff's claim of racial discrimination in failing to

promote her to the position of District Manager in 2005 is barred by Title VII's requirement that

a charge of discrimination be filed within 300 days of the unlawful employment practice.

Plaintiff does not dispute that her suit, filed on April 4, 2008, was filed more than 300 days after

her non-promotion, but counters that it is rendered timely by application of the Lilly Ledbetter

Fair Pay Act of 2009.

This Act, which became law on January 29, 2009, amends Title VII by adding the

following provision to 42 U.S.C. § 2000e-5(e):

> For purposes of this section, an unlawful employment practice occurs, with respect to
> discrimination in compensation in violation of this title, when a discriminatory
> compensation decision or other practice is adopted, when an individual becomes subject
> to a discriminatory compensation decision or other practice, or when an individual is
> affected by application of a discriminatory compensation decision or other practice,
> including each time wages, benefits, or other compensation is paid, resulting in whole or

in part from such a decision or other practice.

Pub.L. No. 111-2, 123 Stat. 5 (2009). The Act applies to all claims of discrimination in compensation under Title VII that are pending on or after May 28, 2007. *Id.* The intent and effect of this act is to overrule *Ledbetter v. Goodyear Tire & Rubber Co.*, 550 U.S. 618 (2007), which ruled that the continuing effects of a past employment decision which was made with discriminatory intent do not transform a subsequent employment act which is unaccompanied by discriminatory intent into a present violation.

The Fair Pay Act is inapplicable here because the plaintiff has not stated any claim of discrimination in compensation. *See* pretrial order, Dk. 25. Compensation claims are fundamentally different from claims based on "discrete facts" such as failures to promote or terminations, because in compensation claims the discrimination accumulates over an extended period of time and plaintiffs are often initially unaware that they are being paid an unequal wage. *See Ledbetter*, 550 U.S. at 645, 649 (Ginsburg, J., dissenting), citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002). Neither plaintiff's failure to promote claim nor her constructive termination claim is a compensation claim protected by the Fair Pay Act. Accordingly, both claims are untimely under Title VII.

Nonetheless, the pretrial order indicates that the same claims have been brought pursuant to 42 U.S.C. §1981, *see* Dk. 25, pp. 5-11. This statute imposes a different period of limitations than does Title VII, and lacks its administrative requirements. Having reviewed the facts, the court finds that the promotion the plaintiff desired is best characterized as a mere advancement in her career path, rather than as a new and distinct employment relationship, so is subject to a four-year statute of limitations. *See Jones v. R.R. Donnelley & Sons Co.,* 541 U.S. 369 (2004);

*Cross v. Home Depot*, 390 F.3d 1283, 1288-89 (10th Cir. 2004) (finding the four-year statute of limitations of 28 U.S.C.§1658 applies to claims that are based on post-contract-formation conduct arising under §1981 after December 1, 1990); *Brown v. Unified School Dist. 501, Topeka Public Schools,* 465 F.3d 1184, 1188 (10th Cir. 2006). Plaintiff's complaint was filed in April of 2008, well within this four-year period. Accordingly, the court examines the merits of plaintiff's claims under §1981 only.

**Failure to promote** - **1981**

The standards and burdens under §1981 are the same as those under Title VII. *Salguero v. City Of Clovis*, 366 F.3d 1168, 1175 (10th Cir. 2004). Where, as here, a plaintiff relies on circumstantial, rather than direct, evidence to support a discrimination claim, the court applies the burden-shifting framework set forth by *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). Under *McDonnell Douglas*, the plaintiff must first establish a prima facie case of discrimination.

To establish a prima facie claim of disparate treatment based on race in a failure to promote context, the plaintiff must show: (i) the plaintiff is a member of a protected class; (ii) the plaintiff was qualified and applied for the position; (iii) despite the plaintiff's qualifications, she was not promoted to the position; and (iv) the promotional opportunity was filled or remained open. *See Jaramillo v. Colo. Judicial Dep't*, 427 F.3d 1303, 1306-07 (10th Cir. 2005) (citing *Cross*, 390 F.3d at 1286). "[T]he critical prima facie inquiry in all cases is whether the plaintiff has demonstrated that the adverse employment action occurred 'under circumstances which give rise to an inference of unlawful discrimination.' " *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1227 (10th Cir. 2000) (quoting *Texas Dep't of Community Affairs v.*

*Burdine*, 450 U.S. at 253).

If the plaintiff meets this burden, the defendant must articulate a legitimate, nondiscriminatory reason for its decision. *Jaramillo*, 427 F.3d at 1307. This burden is "exceedingly light." *Zamora v. Elite Logistics, Inc*., 478 F.3d 1160, 1165 (10th Cir.2007) (en banc). If the defendant meets this burden of production, the plaintiff survives summary judgment only by showing that, more likely than not, the proffered explanations are a pretext for unlawful discrimination. *See   Jaramillo*, 427 F.3d at 1307.

Assuming, without deciding, that the plaintiff has established a prima facie case, the court finds that the defendant has sufficiently articulated a legitimate, nondiscriminatory reason for its promotion of Ms. Beran instead of the plaintiff - that defendants believed Ms. Beran was better qualified for the DM position. *See Turner v. Public Service Co. of Colorado*, 563 F.3d 1136, 1143 (10th Cir. 2009) (holding defendant is not required to prove its claim and is only required to put forth enough evidence to carry its burden of production and rebut the plaintiff's prima facie case). The burden thus shifts back to plaintiff to show that this justification was merely a pretext for race discrimination. *Goodwin v. Gen. Motors Corp*., 275 F.3d 1005, 1013 (10th Cir.), *cert. denied*, 537 U.S. 941 (2002).

**Pretext**

 "A plaintiff demonstrates pretext by showing either that a discriminatory reason more likely motivated the employer or that the employer's proffered explanation is unworthy of credence." *Stinnett v. Safeway*, Inc., 337 F.3d 1213, 1218 (10th Cir.2003) (quotation omitted). Plaintiff asserts only the latter. A plaintiff may establish pretext by showing "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered

legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir.1997) (quoting *Olson v. Gen. Elec. Astrospace*, 101 F.3d 947, 951-52 (3d Cir.1996)). "Evidence of pretext may . . . take a variety of . . . forms," but "defeats summary judgment only if it could reasonably lead the trier of fact to infer a discriminatory motive." *Swackhammer v. Sprint/United Mgmt. Co.*, 493 F.3d 1160, 1168 (10th Cir. 2007). "Mere conjecture that [an] employer's explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment." *Branson v. Price River Coal Co.*, 853 F.2d 768, 772 (10th Cir.1988).

The plaintiff asks the court to infer pretext based in part upon her superior qualifications for the position. The Tenth Circuit has recently cautioned that this manner of showing pretext is difficult, requiring a demonstration of "overwhelming" merit disparity.

> We will draw an inference of pretext where "the facts assure us that the plaintiff is better qualified than the other candidates for the position." *Jones v. Barnhart*, 349 F.3d 1260, 1267 (10th Cir.2003) (citing *Rea v. Martin Marietta Corp.*, 29 F.3d 1450, 1457-58 (10th Cir.1994)). We have cautioned that "pretext cannot be shown simply by identifying minor differences between plaintiff's qualifications and those of successful applicants," but only by demonstrating an "overwhelming" merit disparity. *Bullington v. United Air Lines, Inc.*, 186 F.3d 1301, 1319 (10th Cir.1999), *overruled on other grounds by Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002). Moreover, we acknowledge that it is not our role to "act as a super personnel department that second guesses employers' business judgments." *Simms v. Oklahoma ex rel Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1329 (10th Cir.1999).

*Santana v. City and County of Denver*, 488 F.3d 860, 865 (10th Cir. 2007).

### Qualifications

The plaintiff grew up in Larned, Kansas, had worked in Emporia and Great Bend, and was familiar with western Kansas. She had never worked for UMB in western Kansas, but had

worked for First National Bank in Dodge City as a Customer Service Representative, vault teller, and proof operator from 1983 to 1987. After an extended maternity leave, she worked for Fidelity State Bank in Dodge City as a bank teller and customer service representative from 1988 to 1990. At that time, she was well known within the banking community and was a highly sought after employee within the banking community in central and western Kansas in part because of her race.

From 1990 until 1995, the plaintiff gave birth to two children and remained off of work, caring for her four children, until she rejoined the work force with Stage Stores, Inc. Plaintiff was hired to open a new store in Larned, Kansas after having received training in the Stage Retail Program. She worked as a retail store manager for Stage Stores and traveled to Pratt, Great Bend, and Larned. Her duties included community involvement, hiring and training new employees, and evaluating the work performance of the store employees. In September of 1998, Plaintiff applied for a position with the Bank of America and because of her banking experience and ability, was offered a Bank Center Manager position by Bank of America in Great Bend, Kansas. In an effort to better understand the Bank of America culture, she declined the manager position but accepted the position of personal banker.

In an effort to enhance her employment and promotional opportunities Plaintiff accepted a transfer to Emporia, Kansas in 2000 with the Bank of America. In 2001 Plaintiff transferred from Emporia to Topeka with the Bank of America and worked as a personal banker at the 29th and California Branch location. In 2002, Plaintiff became the Branch Center Manager for the Bank of America at 29th and California. While employed with Bank of America, Plaintiff led her team of employees to several performance awards including Excellent Customer Service Award,

Top Sales Award, and Customer Satisfaction Award. Plaintiff received recognition, in the form of Branch Bonuses, for being one of the top performing managers in the region which included all of the State of Kansas and northern Oklahoma. While employed at Bank of America in Great Bend, Emporia, and Topeka, the plaintiff was an active member of the Chamber of Commerce, had extensive community involvement, and made regular business calls to existing and potential commercial customers. Her duties for Bank of America at Great Bend and Emporia included being a Personal Banker, Customer Service, developing growth of the bank in products and customers, establishing new banking relationships in surrounding communities, opening new accounts, writing mortgages and consumer and commercial loans.

Plaintiff was recruited by Ms. Koerner and Pat Michaelis in January of 2004 to join the UMB Bank team. During her first year as Banking Center Manager of the Topeka North branch for UMB, plaintiff received several certificates of achievement recognizing her and her team for top performance in sales, customer service, and employee retention. Her leadership skills were used to train existing employees and new hires. She had a clear understanding of the company vision and goals, including the development of a new sales culture at UMB and demonstrated her willingness to support the success of UMB Bank within the banking community. She was the top producer in mortgage lending, did a good job promoting the sales atmosphere at UMB, and maintained her position as a top performing leader throughout her employment with UMB Bank. She had been trained in the old Omega sales program, and was skilled in the new Sales Essentials program which replaced the Omega program. She had been with UMB less than one year and one half at the time the promotion decision was made.

Ms. Beran, who lives in Claflin, Kansas, was a 13-year employee of UMB who had

always worked out of UMB's Hudson and Great Bend, Kansas markets. She started as a teller and was promoted to Personal Banker Representative ("PBR") in 2000. As a PBR, Ms. Beran was responsible for handling new personal and commercial accounts, certificates of deposit, IRAs, and customer service complaints and concerns. She had no experience handling mortgage loans. Beginning in 2002, Ms. Beran regularly traveled to the Bank 30 branches in Central and Western Kansas, providing sales training, coaching, and information to those branches and working with the employees of those branches to improve their sales culture and skills. She had become the sales lead in those areas and was familiar with UMB's clients and associates in western Kansas. She was well trained in the Omega sales program and had substantial knowledge of the sales culture at UMB and the systems the Kansas branches used.

In 2004, Ms. Beran was part of a four-person team that managed UMB's Great Bend and Hudson, Kansas branches for eight months in the absence of a Market President there. She recognized that in Topeka there was a more focused sale culture, a different charter, and different management techniques that she worked with at UMB. Her primary role in 2005 after she received the DM position was to focus on implementing UMB's new structure and sales program to the Bank 30 branches, which did not include Topeka.

A comparison of the plaintiff's qualifications with those of Ms. Beran gives the court no reason to question defendant's explanation for its hiring decision. Plaintiff's evidence does not show that she was overwhelmingly better qualified than Ms. Beran. At most, the other candidate was similarly qualified, although her strengths were in different areas than were the plaintiff's. The fact that UMB Bank chose between them is not evidence of pretext. Pretext is assessed by examining "the facts as they appear to the person making the decision to [promote the] plaintiff."

*Kendrick*, 220 F.3d at 1231. *See Simms*, 165 F.3d at 1329-30 (an employee's opinion about his or her qualifications does not give rise to a material factual dispute). It is the manager's perception of the employee's performance that is relevant, not plaintiff's subjective evaluation of his own relative performance. *Furr v. Seagate Technology, Inc.*, 82 F.3d 980, 988 (10th Cir.1996), *cert. denied* 519 U.S. 1056 (1997); *Branson v. Price River Coal Co.*, 853 F.2d 768, 772 (10th Cir.1988). Plaintiff's opinion that the decisionmakers were wrong in their assessment of her qualifications does not constitute facts that demonstrate pretext. *See Bullington v. United Air Lines, Inc*., 186 F.3d 1301, 1317 (10th Cir.1999). Nor does a plaintiff demonstrate pretext if an employer, using non-discriminatory criteria, makes a decision to hire from among comparably qualified candidates. *Id*. at 1319.

### Lack of interview

Plaintiff additionally alleges that defendant's failure to interview her for the position "demonstrates a sufficient disparity standing alone to justify a strong inference of pretext." Dk. 42, p. 23.[2] That the plaintiff was not formally interviewed for the position is not as damaging as the plaintiff states, however, given that Ms. Koerner was well aware of the plaintiff's interest in and qualifications for the DM position, spoke to the plaintiff about the position, coached the plaintiff for promotions in general if not for this particular one, and seriously considered her for the DM promotion. Little, if any, procedural irregularity has been shown.

### Same actor inference

Defendant contends that it is nonsensical to infer racial animus where, as here, the

---

[2]The plaintiff additionally asserts that Ms. Koerner did not grant her request to speak to Mr. Michaelis about the DM position, Dk. 42, Hinson affidavit, p.4, but this is a bare assertion the significance of which has not been shown.

persons who allegedly terminated the plaintiff - Ms. Koerner and Mr. Michaelis - were the same persons who initially recruited and decided to hire her. The Tenth Circuit adopted this "same actor inference" in *Antonio v. Sygma Network, Inc.*, 458 F.3d 1177, 1183 (10th Cir. 2006), stating:

> [I]n cases where "the employee was hired and fired by the same person within a relatively short time span," there is "a strong inference that the employer's stated reason for acting against the employee is not pretextual." *Proud*, 945 F.2d at 798. We emphasize, however, that "[t]he plaintiff still has the opportunity to present countervailing evidence of pretext," *id.*, and that "same actor" evidence gives rise to an inference, rather than a presumption, that no discriminatory animus motivated the employer's actions, *see Williams*, 144 F.3d at 1443; *Waldron*, 56 F.3d at 496 n. 6.

Plaintiff was hired in January of 2004 and did not receive the DM promotion sometime in the first quarter of 2005. The promotion decision occurred within a relatively short time after the plaintiff's hiring, warranting the strong inference that the defendants' stated reason for acting against the plaintiff is not pretextual. *See Antonio,* 458 F.3d at 1183 (citing cases applying the inference whose time periods ranged from eight days to four years).

### Racial statements/reasons

As countervailing evidence of pretext, the plaintiff states that Mr. Michaelis admitted to her soon after the decision was made that part of the reason she did not get the DM promotion was because of "her racially mixed and blended family." Dk. 42, p. 25. Defendant dismisses the comment as inaccurate, "isolated and ambiguous," and too abstract to support an inference of discrimination. Dk. 45, p. 19.

It is true that "isolated racial comments are insufficient to establish pretext unless they can somehow be tied to the employment actions disputed in the case at hand." *E.E.O.C. v. BCI Coca-Cola Bottling Co. of Los Angeles*, 450 F.3d 476, 489 (10th Cir. 2006) (quotations omitted).

Here, according to the plaintiff's testimony, Mr Michaelis admitted that the plaintiff's "family situation" actually played a role in the defendant's decision not to promote the plaintiff to the desired position. Accordingly, the court takes a closer look at the comment.

The record fails to support the plaintiff's assertion that Mr. Michaelis referred to plaintiff's "racially mixed and blended family." When asked what concerns she had voiced about her employment to Ms. Koerner, the plaintiff replied:

> ...There was a lot of apologies. Pat [Michaelis] came over a couple weeks after the decision had been made and tried to reassure me that I was important to the team and that they, for political reasons and because of my family situation, wanted to go with someone different.

Dk. 28, Ex. 1, p. 65-66. Plaintiff admitted that she had "no way of knowing" what Mr. Michaelis meant by using the term "political reasons," but she interpreted it to mean "that they were in the middle of a conversion and they did not want all the leadership coming from Topeka." *Id.*

When asked what Mr. Michaelis's meant by "family situation," the plaintiff stated:

> I know how I interpreted it. Family situation, my husband and I are interracially. We're an interracial couple. And I was – and we have a very large family because we've blended our families together ... I was very offended by that comment because at that point I assumed that – it made me feel that he was making his decision based on – my ability to do the job based on my family and my marriage and who I am, my personal life. It had nothing to do with my ability to do my work.

*Id.* at 67.

> Q. Did he ... say anything else about that or did he just use the words "family situation"?
>
> A. He was so flippant about it in just that he just threw that in as kind of a – I felt like, you know, we got to tell her something, you know, let's say, well, you know – so I think he was using it as a way to try to make me feel better, but I didn't – I didn't perceive it as, you know, I thought what do you mean by that. Were there any other words meant or did he say anything else? No, I mean, it was just a comment about my family.
>
> Q. Did he say anything about you and your husband's relationship or anything about your husband at all?

A. At that meeting? He didn't say anything about Tom at that time. Tom is my husband. There were comments later that, you know, he said he liked Tom. Tom's a nice guy.

*Id*., p. 68-69. Plaintiff also mentioned this conversation when asked if she had heard any UMB employee say anything that was racially offensive. *See id*, p. 131-33.

Mr. Michaelis's statement about the plaintiff's "family situation" is ambiguous - it could refer to the ages of children the plaintiff was responsible to care for, to plaintiff's admittedly "very large family," to a belief that the job required too much travel for the well-being of plaintiff's family, to plaintiff's marriage to a man of another race, or to other matters. It is thus insufficient to constitute direct evidence of race discrimination.[3] *See Hall v. U.S. Dept. of Labor, Admin. Review Bd.,* 476 F.3d 847, 857 (10th Cir.) (supervisor's direction to "turkey farm" an employee was ambiguous so was not direct evidence of retaliation), *cert. denied,* 552 U.S. 993 (2007); *Danville v. Reg'l Lab Corp*., 292 F.3d 1246, 1249 (10th Cir. 2002) (decision-maker's comment during selection committee meeting that plaintiff "might not be around very long" could have referred either to plaintiff's age or to her tendency to change jobs frequently, so was only circumstantial evidence of discrimination); *York v. American Tel. & Tel. Co.*, 95 F.3d 948, 953 (10th Cir.1996) (ambiguous statements which are not discriminatory on their face warrant *McDonnell Douglas* test). Further, the record does not reveal what weight was given by the decision-makers to the plaintiff's "family situation," or if it was a motivating factor for the decision.

Plaintiff testified that she believed that Mr. Michaelis's "family situation" comment was race-based because Mr. Michaelis occasionally got tickets to social events, and on more than one

---

[3]No claim of sex discrimination has been made.

occasion he had not invited her and her husband to events but had invited other couples. The plaintiff admitted that he had asked them to one such event which they attended, was unable to name any event to which she had not been invited, and stated that she and her husband annually attended the office Christmas party as well. *Id.* p.132-34. This evidence thus carries little weight.

Nonetheless, the statement, if interpreted by a jury in the same manner as interpreted by the plaintiff, provides some circumstantial evidence of pretext. At this stage, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge ..." *Anderson*, 477 U.S. at 255. Similar statements have been found sufficient to defeat summary judgment. *See Toth v. Gates Rubber Co.*, 216 F.3d 1088, 2000 WL 796068, 10 (10th Cir. 2000) (finding an ambiguous comment sufficient to raise a genuine issue of material fact as to pretext, reversing district court); *Tungol v. Certainteed Corp.*, 202 F.Supp.2d 1189, 1200 (D.Kan. 2002) (finding negative comments about employee's "communication skills" on his performance evaluation may have been based on employee's foreign accent, so raised genuine issue of material fact regarding pretext); *Cf*, *Bradshaw v. St. Catherine's Hosp.*, 984 F.Supp. 1357, 1362 (D.Kan.1997) (finding a derogatory remark by a decisionmaker regarding employee's inter-racial marriage to be ambiguous and, together with other evidence, sufficient to raise a genuine issue of material fact regarding pretext).

Additionally, that Mr. Michaelis allegedly gave the plaintiff different and seemingly inconsistent reasons for her non-selection ("political reasons" and "family situation") than defendants now proffer (inferior qualifications) raises some inference of pretext. *See Whittington v. Nordam Group Inc*., 429 F.3d 986, 994 (10th Cir. 2005) (holding that inconsistency in employer's reasons for the termination is an indication of pretext); *Plotke v. White*, 405 F.3d

1092, 1104 (10th Cir. 2005) (holding that conflicting and changing evidence concerning the timing and reasons for termination contributes to a showing of pretext). In light of all the evidence, the court finds a material question of fact as to the reasons for the plaintiff's non-promotion in 2005. Although a jury may agree with defendant that the plaintiff was not denied the DM promotion based on her race, that is not for this Court to decide.

**Constructive discharge - 1981**

Section 1981 prohibits the termination of contracts on the basis of race, and thus encompasses claims of constructive discharge. *See* 42 U.S.C. § 1981(b). Such claims are, however, difficult to prove.

> Even if an employee resigns, the plaintiff may still satisfy the adverse employment action requirement by demonstrating that he was constructively discharged. The plaintiff's burden in establishing constructive discharge is substantial. *EEOC v. PVNF, LLC*, 487 F.3d 790, 805 (10th Cir.2007); *see also Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1221 (10th Cir.2002) (explaining "[t]he bar is quite high in [constructive discharge] cases"). A constructive discharge occurs only "when an employer, through unlawful acts, makes working conditions so intolerable that a reasonable person in the employee's position would feel forced to resign." *Exum*, 389 F.3d at 1135.

*Fischer v. Forestwood Co., Inc.*, 525 F.3d 972, 980 (10th Cir. 2008).

Defendant asserts that the voluntary nature of the plaintiff's resignation is shown by the e-mail she sent to the defendant, stating:

> This letter is to inform you that I have made the decision to resign from my position as Banking Center Manger (sic) of UMB of Topeka North.
> I have accepted a position at another financial institution, and for personal reasons I've decided that UMB in (sic) no longer a good fit for me.
> I've appreciated the opportunity to meet and work with some outstanding individuals during these last three years.
> Donavan is currently at the branch visiting with associates concerning the guard issue, so I have asked that he conduct my exit interview.

Dk. 28, Exh. 6. The court does not find this email to be dispositive, because "[w]hen examining

a constructive discharge claim, we disregard both the employee's subjective view of the workplace environment and the employer's subjective intentions regarding the employee." *Baca v. Sklar*, 398 F.3d 1210, 1216 (10th Cir. 2005). Instead, the court evaluates the voluntariness of the plaintiff's resignation under an objective, totality of the circumstances standard. *See Fischer*, 525 F.3d at 980, citing *Exum v. U.S. Olympic Committee*, 389 F.3d 1130, 1136 (10th Cir. 2004).

In support of her constructive discharge claim, the plaintiff initially points to the same evidence relied on to support her failure to promote claim. But an employee cannot survive summary judgment on a constructive discharge claim merely by producing evidence showing that working conditions were difficult, unpleasant, or even discriminatory. *See Exum*, 389 F.3d at 1135. Thus in *E.E.O.C. v. PVNF*, 487 F.3d 790, 806 (10th Cir. 2007), the Court affirmed judgment as a matter of law on a constructive discharge claim even though the defendant repeatedly subjected female employees to sexually explicit and derogatory remarks. Similarly, in *Daemi v. Church's Fried Chicken, Inc.*, 931 F.2d 1379, 1386 (10th Cir.1991), national origin harassment including the employer's derogatory remarks about the fact the plaintiff was Iranian, did not make the workplace sufficiently intolerable that the plaintiff was constructively discharged. In comparison, where a supervisor made it nearly impossible for the plaintiff to continue performing her job, constructive discharge was found. *Acrey v. American Sheep Industry Ass'n*, 981 F.2d 1569, 1574 (10th Cir.1992).

Discriminatory animus, actionable harassment, or discriminatory acts are insufficient to warrant constructive termination, absent additional aggravating factors.

> Even some evidence of discriminatory animus in the workplace will not necessarily establish a constructive discharge claim. *See Penn. State Police v. Suders*, 542 U.S. 129, 147, 124 S.Ct. 2342, 159 L.Ed.2d 204 (2004) ("A hostile-environment constructive discharge claim entails something more [than conduct that amounts to

> actionable harassment]"); *Bennett v. Quark, Inc*., 258 F.3d 1220, 1229 (10th Cir.2001), *overruled on other grounds by Boyer v. Cordant Technologies, Inc*., 316 F.3d 1137, 1140 (10th Cir.2003) ("[A] finding of constructive discharge may not be based solely on a discriminatory act; there must also be aggravating factors that make staying on the job intolerable.") (internal quotation marks omitted); 1-15 Larson on Employment Discrimination § 15.08 (2007) ("The mere existence of discrimination will not normally constitute the kind of intolerable conditions that would make a reasonable person feel compelled to quit.").

*Fischer v. Forestwood Co., Inc*., 525 F.3d 972, 981 (10th Cir. 2008). Accordingly, even assuming, arguendo, that the plaintiff's race was a motivating factor in the decision not to promote her, this does not constitute the kind or degree of intolerable condition necessary for a constructive discharge claim.

The plaintiff makes two new allegations in support of this claim: 1) that the Midtown branch was known as the "ghetto" branch, which is "a negative and stereotypical reflection of the minority clientele and location," and 2) that five of her white coworkers were promoted to Regional management positions but she was never promoted despite repeated promises. Dk. 42, p. 26.

The sole evidence of record regarding use of the word "ghetto" is by Ms. Neil, who stated that she had heard that term used to describe the Midtown branch, which was "not in the greatest location." Dk. 42, Exh. 3, Neil depo at 11. The plaintiff did not work in the Midtown branch. No facts indicate who made the comment, how often it was made, where it was made, or in what context. No testimony suggests that the plaintiff ever heard this term used at work, or that any manager at UMB ever used it. This comment is thus isolated, ambiguous, and too abstract to support any inference of discrimination,[4] let alone to constitute the kind of intolerable

---

[4]"[Discriminatory] comments by non-decisionmakers are not material in showing [defendant's] action was based on ... discrimination." *Cone v. Longmont United Hosp. Ass'n*, 14

conditions that would support a constructive termination claim.[5]

Plaintiff's claim that five of her white coworkers were promoted is equally unavailing. No showing has been made that the plaintiff was qualified for the positions they received, or that she ever applied for any of them. Two of the promotions were given to plaintiff's superiors, Ms. Koerner and Pat Michaelis, and two related to finances or auditing, which expertise the plaintiff does not contend to have. *See* Dk. 42, p. 18 (noting promotions to Regional Treasury Management Officer and to Regional Auditor). Even had the plaintiff made those showings, however, no reasonable inference could be drawn from the facts of record that any of the five promotional decisions was based upon race. Further, no claim is made that any of those positions had been promised to the plaintiff, but even a failure to receive a promised promotion is a far cry from a constructive termination.

In light of all the evidence, including that shown in support of the plaintiff's failure to promote claim, the court finds that the evidence, viewed objectively, cannot support a constructive discharge claim, as a matter of law.

IT IS THEREFORE ORDERED that the defendant's motion for summary judgment is granted as to all claims but the plaintiff's claim under §1981 for failing to promote her in 2005 to the position of District Manager.

Dated this 13th day of January, 2010.

s/ Sam A. Crow
Sam A. Crow, U.S. District Senior Judge

---

F.3d 526, 531 (10th Cir.1994).

[5]The court notes that no claim of hostile work environment racial harassment is made or would be warranted by the facts.